# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### February 2, 2010 Session

## STATE OF TENNESSEE v. DAR ES SALAAM COLE AND THOMAS LOPEZ

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-01445    Paula Skahan, Judge**

---

**No. W2009-00174-CCA-R3-CD  - Filed December 6, 2010**

---

The Defendant-Appellants, Dar Es Salaam Cole and Thomas Lopez, were convicted by a Shelby County Jury of facilitation of the sale of 300 grams or more of cocaine and unlawful possession of 300 grams or more of cocaine with the intent to sell or deliver.  After a sentencing hearing, the trial court merged the above convictions and sentenced Cole and Lopez to nineteen years imprisonment in the Tennessee Department of Correction.  In this consolidated appeal, Lopez argues that (1) the trial court erred in denying his motion to suppress and (2) the evidence was insufficient to sustain his convictions.  In addition to these issues, Cole argues that (3) the traffic stop was racially motivated in violation of the Fourteenth Amendment's equal protection clause; (4) the jury was "impermissibly influenced" by (a) the presence of the prosecutor and defense counsel in the jury room during deliberations, and (b) comments by the trial court while instructing the jury; and (5) the trial court failed to discharge the jury when there was no probability for agreement and failed to charge "a deadlock (Kersey) instruction."  Upon our review, we discern no reversible error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JERRY L. SMITH and J. C. MCLIN, JJ., joined.

Greg Hays, Memphis, Tennessee, for the Defendant-Appellant, Dar Es Salaam Cole.
Jason Poyner, Memphis, Tennessee, for the Defendant-Appellant, Thomas Lopez.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Chris Scruggs, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case stems from a traffic stop, wherein a drug dog alerted to the presence of two kilograms of cocaine inside the subject vehicle. Both Cole, the driver of the vehicle, and Lopez, the passenger, were arrested and subsequently filed motions to suppress the evidence obtained as a result of the stop.

**Hearing on Motions to Suppress.** At the time of the offense, Shelby County Sheriff's Officer Donald Wolfe was assigned to the West Tennessee Drug Task Force. On October 25, 2006, around 6:00 or 7:00 a.m., he stopped Cole's vehicle, a gray Ford F-150 truck, on Interstate 40, east of Airline Road in Memphis, Tennessee, for speeding. He testified that the vehicle was traveling 73 miles per hour in a 65 mile-per-hour speed zone. The speed of the vehicle was verified by stationary radar, which had been calibrated the previous year and successfully "self-tested" that same morning.

Upon stopping the vehicle, Officer Wolfe approached the passenger side and observed two individuals, Cole and Lopez. Officer Wolfe observed that Lopez was in the passenger seat with his eyes closed and that there was no luggage in the bed of the truck. He asked Cole to step out of the vehicle, requested his driver's license, and informed Cole that he would be issued a warning if "everything came back . . . and [his license was not] suspended or anything[.]" Cole did not have his driver's license; however, he provided Officer Wolfe with a change of address card showing his identity. Cole also advised Officer Wolfe that the vehicle was a rental.

Cole told Officer Wolfe that he was coming from Dallas, Texas, and driving to Clarksville, Tennessee, to visit his sister who was pregnant. Officer Wolfe testified that Cole exhibited nervous behavior:

> When you'd ask Mr. Cole a direct question prior to answering the question he
> would – he would start to stutter before answering the question. He had a lot
> of body movement, just – he put his hands behind his back. I asked him not
> to do that because I didn't know if he had any weapons or anything of that
> nature on him. That was for my safety.

Based on his thirteen years of experience in law enforcement and numerous drug arrests, Officer Wolfe concluded that Cole was involved in criminal activity.

Cole consented to a pat-down search of his pockets for weapons. Officer Wolfe asked Cole "if he would mind having a seat in [his vehicle] with him[,]" and Cole complied. While Officer Wolfe and Cole were in his vehicle, Officer Wolfe called the Blue Lighting

Operation Center ("BLOC"), a national law enforcement database, to verify Cole's license and vehicle information. Within minutes of making this call, Cole provided verbal and written consent to search the vehicle. Officer Wolfe then stepped out of his vehicle and spoke to the passenger. The passenger, Lopez, had no identification and was patted down for officer safety. Officer Wolfe then asked Lopez to sit in vehicle while he began the vehicle search.

Officer Wolfe was accompanied by "Hydro[,]" a Labrador Retriever trained at the United States Police Canine Association as a narcotics detection dog. On the day of the offense, Hydro had been in service for three years and had been re-certified each year. Hydro assisted in the search of the vehicle and alerted to the presence of drugs. Officer Wolfe knew that Hydro had alerted to the presence or odor of drugs on the day of the offense because Hydro's nose made an audible sound and "pop[ped] like a motor boat in water[.]" Officer Wolfe also testified that Hydro alerted to the presence of drugs based on other signs which included Hydro's aggressive breathing, the hairs on his back standing up, and his "final scratch" in the area from which the strongest odor of drugs emanated. As a result of the search, two separate packages of drugs were located "on the front wall [of the truck] in between the wall and the bed liner itself." A photograph showing the drugs in this location was admitted into evidence. At the time that Hydro alerted to the presence or odor of drugs, Officer Wolfe had not yet received confirmation from BLOC regarding Cole's license and vehicle information.

A video of the entire episode was introduced into evidence. A real time clock in the videotape footage displayed the chronology of events from the point that Officer Wolfe pulled his vehicle behind Cole's vehicle for speeding to point of the recovery of the drugs and the arrest. The video also recorded statements of both Cole and Lopez while they were in the back seat of Officer Wolfe's vehicle. Significantly, when the officers were about to discover the location of the drugs during their search of the vehicle, the recording reveals the following exchange between Cole and Lopez:

> Cole:      Hey, hey . . .
>
> Lopez:     They going in there . . .
>
> Cole:      No they ain't.

When the officers located the drugs, Cole made the following exclamations: "We done f---ed up . . . [b]igtime[,]" "We're screwed[,]"and "How much time do you think we gone get[.]" A sample of the substance recovered from the vehicle was sent to the Tennessee Bureau of Investigation (TBI) for testing and was later confirmed to be cocaine.

-3-

On cross-examination, Officer Wolfe conceded that it was normal for someone to be "initially nervous" when pulled over by the police. He believed, however, that the nervous behavior should subside after the police officer explained that the person was likely to be issued a warning. He also conceded that he had never met Cole prior to this arrest and did not know if Cole normally stuttered. Officer Wolfe did not read the consent to search form to Cole nor did he verify Cole's signature, which appeared to be the letter "O".

Cole testified that he signed the consent to search form with an "O" because he felt pressured to sign the form. He said he felt pressured because he was sitting in the back seat of the officer's vehicle. However, he conceded that he had interacted with law enforcement on previous occasions and had been given his Miranda rights several times prior to this offense.

The trial court denied the motions to suppress in an eight-page written order. Significantly, the trial court made the following findings of fact:

1. Mr. Cole was driving eight miles per hour over the speed limit when Officer Wolfe stopped his vehicle.

2. Officer Wolfe asked both defendants whether they would mind sitting inside his police vehicle; they were not ordered to do so.

3. The canine sweep was completed before BLOC reported back to Officer Wolfe.

4. The police department has used the narcotics detection dog, Hydro, for approximately three years.

5. Hydro has worked for Officer Wolfe for two years.

6. Officer Wolfe and Hydro participate in annual training at the United States Police Canine Association[] and receive an additional five hours of training a month.

7. Mr. Cole's ordinary signature resembles the symbol "O."

**Trial.** At the jury trial, Officer Wolfe provided the same testimony as he did at the hearing on the motions to suppress. In addition, he identified Cole as the driver of the vehicle and Lopez as the passenger. He also testified that the rental agreement found in Cole's vehicle showed a "date-out" of October 24, 2006, that the vehicle was not to leave

Texas, and that the return date was October 25, 2006, the day of the offense. Officer Wolfe believed this information to be inconsistent with Cole's statement that he was visiting his sister for a few days. Officer Wolfe testified that the drugs recovered from the vehicle were tagged and boxed as evidence. He verified at trial that the tag number placed on the packages was the same as the number initially placed on the evidence.

Mike Lewis, a special agent with the West Tennessee Violent Crime and Drug Task Force, confirmed that he retrieved the substance recovered in the instant offense and submitted it to the TBI to be analyzed. Melanie Johnson, a TBI special agent forensic scientist, testified that she received the substance from Agent Lewis. She confirmed that both packages were cocaine, weighing 991.3 grams and 1005.3 grams, respectively. The packages of cocaine were valued at "probably [$]27,000 a piece."

The jury convicted Cole and Lopez of facilitation of the sale of 300 grams or more of cocaine and unlawful possession of 300 grams or more of cocaine with the intent to sell or deliver. After a sentencing hearing, they each received an effective sentence of nineteen years to be served at thirty-five percent in the Tennessee Department of Correction.

**I. Motions to Suppress.** Cole and Lopez argue that the trial court erred in denying their motions to suppress. Cole argues that the "time, manner, and scope of the investigation exceeded lawful parameters." Lopez argues that Cole "was 'pressured into' signing the consent to search [form,]" thereby making his arrest and subsequent detention unlawful. In response, the State contends that the trial court properly denied both motions to suppress. We agree with the State.

The standard of review applicable to suppression issues involves a mixed question of law and fact. State v. Garcia, 123 S.W.3d 335, 342 (Tenn. 2003). "[A] trial court's finding of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Cox, 171 S.W.3d 174, 178 (Tenn. 2005) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard in State v. Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23. The trial court's application of the law to the facts is reviewed de novo. State v. England, 19 S.W.3d 762, 766 (Tenn. 2000).

The Fourth Amendment to the United States Constitution and Article 1, Section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. In addition, "a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). The stop of a vehicle and the detention of its occupants constitutes a seizure within the meaning of both the Fourth Amendment to the United States and Article 1, Section 7 of the Tennessee Constitution. Whren v. United States, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 1772 (1996); State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000). When the police have probable cause that a traffic violation has occurred, the decision to stop the vehicle is reasonable. State v. Berrios, 235 S.W.3d 99, 105 (Tenn. 2007) (citing Whren, 517 U.S. at 810, 116 S. Ct. at 1772).

"The 'sniff' of a narcotics-seeking dog is *sui generis* and does not implicate any legitimate privacy interest; consequently, a dog's sniff does not per se constitute a search under the Fourth Amendment and requires neither probable cause nor reasonable suspicion." State v. Harris, 280 S.W.3d 832, 841 (Tenn. Crim. App. 2008) (citing United States v. Place, 462 U.S. 696, 707, 103 S. Ct. 2637, 2644-45 (1983); England, 19 S.W.3d at 766-67). "[A] dog sniff performed on the exterior of a defendant's car 'while he was lawfully seized for a traffic violation' does not rise to the level of a constitutionally cognizable infringement." Id. (citing Illinois v. Caballes, 543 U.S. 405, 409, 125 S. Ct. 834 (2005)).

We conclude that the trial court properly denied the motions to suppress. In regard to the time, manner, and scope of the traffic stop, the record shows that Officer Woods stopped Cole's vehicle for speeding. Within a minute of the initial stop, Officer Woods asked for and received verbal consent to conduct a pat-down search. Officer Woods further asked Cole to sit in the back seat of Woods's vehicle, and Cole complied. During this time, Officer Woods initiated contact with BLOC, the law enforcement database, to perform a records check on Cole. At almost the same time, Officer Woods received verbal and written consent from Cole to search the vehicle. Officer Woods returned to Cole's vehicle and requested Lopez's identifying information. Lopez did not have any identification. Officer Woods then requested Lopez to sit in the back seat of his vehicle while he searched the subject vehicle. Upon searching the vehicle, Hydro, the drug detection dog, quickly alerted to the presence of drugs within the vehicle.

The video showing the entire stop corroborates the above testimony and proof. Moreover, despite Cole's protests that he was not speeding, the trial court credited Officer

Wolfe's testimony. The trial court further found that Hydro, the drug detection dog, sufficiently provided Officer Wolfe with probable cause to search the vehicle and that Cole's written and verbal consent to search the vehicle was voluntarily given. The video also shows that Officer Wolfe spent a significant amount of time ensuring that Cole understood the consent form and he repeatedly advised Cole that he did not have to sign it or consent to the search. The consent to search the vehicle was obtained within the first ten minutes of the traffic stop, and Hydro's alert to the presence of drugs occurred within the next three minutes. The consent to search and Hydro's alert occurred prior to Officer Wolfe receiving verification from BLOC of Cole's driving information. Finally, because Cole was not in custody while he was in the backseat of Officer Wolfe's vehicle, we find no merit to Cole's claim that he should have been told that his comments were being recorded during the search of his vehicle. Nothing in this record preponderates against the findings of the trial court. Accordingly, neither Cole nor Lopez are entitled to relief on this issue.

**II. Sufficiency of the Evidence.** Cole and Lopez argue that the evidence was insufficient to sustain their convictions. The extent of Cole's argument is that "the state's case was circumstantial, no reasonable juror could find the officer's incriminating testimony to be credible . . ., neither Cole nor [Lopez] gave conflicting stories about the particulars of their trip, and Cole consistently maintained that he had not been speeding and that he did not know that the contraband was hidden in the rental vehicle." Lopez argues that, as the passenger in the vehicle, there was "nothing to connect [him] to the cocaine . . . except the garbled taped conversation that was recorded while [he] and [Cole] were in the backseat of [Officer Wolfe's vehicle]." The State argues the proof is sufficient to support the convictions. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." The requirement that guilt be found beyond a reasonable doubt is applicable in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight

given to witnesses' testimony, and must reconcile all conflicts in the evidence. Odom, 928 S.W.2d at 23.

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). This court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

Cole and Lopez were charged with two counts of unlawful and knowing possession of 300 grams or more of a cocaine with intent to sell. T.C.A. § 39-17-417(j)(5). A violation of this offense is a Class A felony. Id. However, they were convicted of facilitation of the sale of 300 grams or more of cocaine. Tennessee Code Annotated Section 39-11-403 defines facilitation of another offense:

> (a) A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

> (b) The facilitation of the commission of a felony is an offense of the class next below the felony facilitated by the person so charged.

We conclude that the evidence was sufficient for a reasonable juror to find Cole and Lopez guilty of facilitation with the intent to sell 300 grams or more of cocaine. The proof regarding intent in this case, as in most cases, was largely circumstantial. However, a jury is permitted to "draw an inference of intent to sell or deliver when the amount of the controlled substance and other relevant facts surrounding the arrest are considered together." Id. § 39-17-419. Moreover, this court has previously upheld drug convictions established by similar proof. See State v. William F. Cartwright, No. M2003-00483-CCA- R3-CD, 2004 WL 1056064, at *4 (Tenn. Crim. App., at Nashville, May 10, 2004) (holding that a large volume of testimony, a street value of 25.5 grams of cocaine, and the absence of drug paraphernalia was sufficient to support an inference and a conviction for intent to deliver).

Here, Cole was driving a vehicle in which Lopez was a passenger and two packages of over 300 grams of cocaine were found. The street value of the cocaine was over $50,000. Officer Wolfe testified that there was no luggage in the vehicle, and Cole's account of his one day trip, from Dallas, Texas, to Clarksville, Tennessee, in a rental vehicle to be returned the next day was suspicious. The videotape recorded various statements by Cole and Lopez from which a jury could reasonably infer knowledge and intent. For example, as the officers were pulling on the cab lining of the truck, the location from which the drugs were ultimately retrieved, Lopez said, "They found it." Cole then exclaimed, "Damn!" This is not a situation where a passenger is convicted based solely on the driver's constructive possession of the evidence in a vehicle. Here, the recorded discussions show that Lopez was fully aware of the presence and location of the drugs. At a minimum, the proof demonstrated that Cole and Lopez were furnishing substantial assistance in the unlawful possession of over 300 grams of cocaine with the intent to sell or deliver. Neither Cole nor Lopez are entitled to relief on this issue.

**III.** **Pretextual Stop.** Cole argues that the traffic stop was racially motivated in violation of the Fourteenth Amendment's equal protection clause. Citing United States v. Freeman, 209 F.3d 464, 468 (6th Cir. 2000), Cole urges this court to review the instant traffic stop within the context established by Freeman. The State contends that Cole has failed to establish a primae facie case of selective prosecution. We agree with the State.

Persons claiming selective enforcement must establish that the law enforcement decision had a discriminatory purpose and produced a discriminatory effect. United States v. Armstrong, 517 U.S. 456, 465, 116 S. Ct. 1480, 1487 (1996). To be successful, a selective enforcement claimant must establish that: (1) the government has singled out the claimant for enforcement action while others engaging in similar activity have not been subject to the same action; and (2) the decision to prosecute rests on an impermissible consideration or purpose. Corp. v. Metropolitan Gov't of Nashville & Davidson County, 36 S.W.3d 469, 480 (Tenn. Ct. App. 2000). The first element requires proof that other non-prosecuted offenders engaged in similar conduct; those offenders violated the same law the claimant is accused of violating; and the magnitude of their violation was not materially different from that of the claimant. Id. As to the second element, the claimant must establish the government singled out a protected class of citizens for enforcement, or the prosecution was intended to deter or punish the exercise of a protected right. Id. at 481.

Here, although Cole's claim of selective enforcement was raised in his written motion to suppress, he did not argue this issue before the trial court and did not provide any proof supporting this issue. As such, upon this record, we are unable to conclude that Officer Wolfe, as an agent of the State, engaged in selective prosecution of Cole or Lopez during the instant traffic stop. Cole is not entitled to relief on this issue.

**IV. Impermissible Influences.** Cole argues the jury was "impermissibly influenced" by the presence of the prosecutor and defense counsel when they were allowed into the jury room to operate computer equipment. The State contends that the trial court did not abuse its discretion in allowing the parties to assist with the computer equipment during deliberations because no deliberations occurred during this time and there was no proof of any extraneous influence. We agree that the trial court erred by ordering both counsel into the jury room during deliberations; however, we conclude the error was harmless.

Tennessee Rule of Criminal Procedure 30.1 governs the procedure for taking exhibits into the jury room. It provides, "Unless for good cause the court determines otherwise, the jury shall take to the jury room for examination during deliberations all exhibits and writings, except depositions, that have been received in evidence." Tenn. R. Crim. P. 30.1. The Advisory Commission Comments state that such good cause for keeping an exhibit from the jury room includes "that the exhibit may endanger the health and safety of the jurors, the exhibit may be subjected to improper use by the jury, or a party may be unduly prejudiced by submission of the exhibit to the jury." Tenn. R. Crim. P. 30.1, Advisory Comm'n Comments. In State v. Jenkins, 845 S.W.2d 787, 793 (Tenn. Crim. App. 1992), this court adopted the procedures provided by Standard 15-4.2 of the ABA Standards for Criminal Justice, Trial by Jury, which has since been revised and redesignated as Standard 15-5.2, which provides:

> (a) If the jury, after retiring for deliberation, requests a review of certain testimony the court should notify the prosecutor and counsel for the defense, and allow all parties to be heard on the jury's request. Unless the court decides that a review of requested testimony is inappropriate, the court should have the requested parts of the testimony submitted to the jury in the courtroom. The court may permit testimony to be reread outside the presence of counsel, with the personal waiver of the defendant and the stipulation of the parties.

ABA STANDARDS FOR CRIMINAL JUSTICE, Standard 15-5.2 (3d ed. 1996) (emphasis added). Also, the Tennessee Supreme Court stated, "The practice of allowing a restatement to the jury, of such portions of the evidence as they may desire to hear, at any time before delivering their verdict; and in the presence of the court, is too well established to be called in question." Van Huss v. Rainbolt & Van Huss, 42 Tenn. 139, 141 (1865) (emphasis added); see also State v. Mary Ann Linder, No. 01C01-9312-CC-00430, 1994 WL 630510, at *2-3 (Tenn. Crim. App., at Nashville, Nov. 10, 1994) (holding that trial court's error in sending trial exhibit into the jury room over defendant's request for open court review subject to harmless error analysis).

-10-

After jury deliberation began in this case, the jury sent several questions to the trial court, including "Will you bring us the video in here?" The court gathered the parties and inquired whether they objected to sending the video to the jury. Because the videotape was admitted into evidence, neither party objected to sending it to the jury. However, the record reflects extensive discussion regarding the process by which the jury would view the videotape. The State was primarily concerned because the computer upon which the video would be played contained other impermissible information. Defense counsel was concerned that the jury could distort the recording or listen to only parts of the recording out of context. The trial court's remedy to the problem was to allow the prosecutor, defense counsel, and a court deputy to enter the jury room to play the video. Apparently, the trial court was conducting other court business in the courtroom, which prevented the jury from viewing the videotape in open court. Both the prosecution and defense counsel objected to entering the jury room to assist the jury with viewing the video.

Ultimately, the trial court made the following statements to the jury regarding the viewing of the videotape:

> All right. Good morning, everybody. Okay. We have a few questions. Will you bring us the video in here? Yes, we will bring the video in here in the jury room. What we're going to do is I'm going to send [both defense counsel and the prosecutor] back there with it. It's [the prosecutor's] computer that works the video, okay. And it also has all of his prosecutor stuff on it, okay.

> So just in the unlikely event that one of you push something, it would pull up all of his stuff so just to be on the safe side we're going to do that. And we'll have the defense lawyers back there to watch him and then to be on the safe side, we'll have a deputy back there also. So that's the reason for that.

> If there are any questions about anything, they'll come back in here and ask me.

> . . . .

> All right, sure. So that shouldn't be any problem. And if there are places you want to go back over, you know, or stop, just let [the prosecutor] know and that shouldn't be any problem. But if, you know, while the lawyers are back there, you know, someone – one of you all makes a comment or something, you know, it's not a huge deal but try to keep your discussions, your deliberations to a minimum, you know, like not at all if you can while

-11-

they're back there, okay. So, you'll watch the video, all right. And take as long as you want.

We conclude that the trial court erred by ordering the prosecutor and defense counsel into the jury room to assist with the viewing of the videotape after jury deliberations had begun. Although the trial court attempted to lessen the impact of counsel's presence in the jury room during deliberations by instructing the jury to keep "[their] deliberations to a minimum, you know, like not at all if you can," the potential for the jury to engage in deliberations during this time was present. Neither counsel nor the court deputy should have been placed in a position to field questions from the jury or be a part of the deliberative process. The more acceptable practice when the jury requests assistance viewing a videotape is to require all parties to be in the courtroom in the presence of the trial judge, the parties, and the court reporter to ensure that deliberations do not occur. See State v. Jikinte Lashane Morris, No. M2005-02909-CCA-R3-CD, 2007 WL 609203, at * 3 (Tenn. Crim. App., at Nashville, Feb. 26, 2007) (concluding no prejudicial error where the trial court allowed a court officer to assist the jury with computer equipment during deliberations but cautioning that such a practice "was not a wise decision and should be avoided by trial courts in the future"). Moreover, we caution all parties in future litigation who intend to introduce evidence in electronic form to be prepared to provide the jury with a means of properly viewing that evidence in the jury room.

We recognize the trial court's need to conduct other ongoing court matters. However, "the sanctity of jury deliberations . . . [is] a basic tenet of our system of criminal justice." United States v. Schwarz, 283 F.3d 76, 97 (2d Cir. 2002). Intrusion upon such deliberations "violates the cardinal principle that the deliberations of the jury shall remain private and secret in every case." United States v. Virginia Erection Corp., 335 F.2d 868, 871 (4th Cir. 1964), abrogated on other grounds by United States v. Olano, 507 U.S. 725, 737-38, 113 S. Ct. 1770, 1779-80 (1993). "The presence of any person other than the jurors to whom the case has been submitted for decision impinges upon that privacy and secrecy." Id. Moreover, "the primary if not exclusive purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence. If no harm resulted from this intrusion, reversal would be pointless." Olano, 507 U.S. at 738, 113 S. Ct. at 1780 (internal citation and quotation marks omitted). We recognize that Olano is a "plain error" case that addressed whether the presence of alternate jurors in the jury room during deliberations who were advised not to participate in the deliberations constituted an unlawful intrusion upon jury deliberations. Id. at 737. Nonetheless, in Olano, the Supreme Court established a framework for analyzing jury "intrusion" cases and emphasized that the ultimate inquiry should always be: "Did the intrusion affect the jury's deliberations and thereby its verdict?" Id. at 739.

Accordingly, we must now determine the effect of the trial court's error in ordering the prosecutor, defense counsel, and the deputy into the jury room during deliberations on the verdict. Here, the record shows that the parties were in the jury room for approximately an hour, the length of the video. Upon their return to the courtroom, neither party objected to anything that occurred in the jury room. Nothing on this record shows that counsel or the deputy participated in the deliberative process or attempted in any way to influence the jury while in the jury room. Finally, Cole does not argue how he was prejudiced by the presence of these individuals in the jury room during deliberations in this case. Accordingly, Cole is not entitled to relief on this issue.

Cole also claims that the trial court improperly influenced the jury when it explained the verdict form by stating, "We, the jury, find the defendant Dar-Es-Salaam Cole guilty of unlawful possession" and failed to provide a similar example for Defendant-Appellant Lopez. Cole argues that the jury "was left with the impression that Cole was guilty in the opinion of the trial court." The State contends that the trial court did not abuse its discretion in its comments to the jury.

Our review of the record shows that the trial court was explaining to the jury how to complete the verdict form. The trial court stated, "Examples of proper verdict form would be – and this is just an example: We the jury find the defendant Dar-Es-Salaam guilty of unlawful possession . . . ." The trial court later used the same example but inserted the words "not guilty" instead of "guilty." It further stated "For Mr. Lopez you will do the exact same thing." In the above context, we cannot conclude that the trial court abused its discretion. Cole is not entitled to relief.

**V. <u>Failure to Properly Instruct the Jury.</u>** Cole argues that the trial court failed to discharge the jury when there was no probability for agreement. He further contends that the trial court failed to "charge a deadlock (Kersey) instruction." The State contends that the trial court properly instructed the jury. We agree with the State.

Here, Cole relies solely upon <u>State v. Kersey</u>, 525 S.W.2d 139, 144-45 (Tenn. 1975), the seminal case in which our supreme court: (1) adopted Sec. 5.4 of the ABA Standards Relating to Trial by Jury; (2) directed its use by the trial courts faced with deadlocked juries; and (3) disapproved of the <u>Allen</u> or "dynamite" charge. <u>See</u> <u>Allen v. United States</u>, 164 U.S. 492, 501, 17 S. Ct. 154, 157 (1896); <u>Commonwealth v. Tuey</u>, 62 Mass. 1, 1-2 (1851). Under <u>Kersey</u>, trial courts "may require the jury to continue their deliberations and may give or repeat an instruction . . . ." <u>Kersey</u>, 525 S.W.2d at 145. Trial courts "shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals." <u>Id.</u> "The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement." <u>Id.</u> The Court

concluded that if a trial court determines upon inquiry that further deliberations may result in a verdict, trial courts may give the following instruction:

> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

> If given as a part of the main charge, it may be repeated should a deadlock develop.

> Judicial economy and uniformity demand these results. Strict adherence is expected and variations will not be permissible.

Id.

As we understand Cole's argument, he contends that the trial court should have charged the jury with the above <u>Kersey</u> instruction when the jury initially reported that they could not reach a verdict. The record shows the trial court, having provided the <u>Kersey</u> instruction in the original instruction, stated:

> I have your latest note, [Jury Foreperson]. As a jury we are not unanimous. What should we do now? Well, you deliberated about an hour yesterday before going home. And you came in today at ten and left I believe about 12:30 for lunch, and came back at 1:30. And from what I understand from the attorneys, it took about 45 minutes to watch the videotape.

> So you really haven't deliberated more than about three hours, which isn't really very long. So what I'd like to ask you to do is to continue deliberating more than about three hours, which isn't really very long. So what I'd like to as you to do is to continue deliberating and hopefully you will be

-14-

able to reach a unanimous verdict. It's two o'clock in the afternoon now. It's not like we have a late hour, you know, where people need to go get their cars or something. And I would like you to continue to deliberate and hopefully this situation will change. If it doesn't, then we'll take that up at that point, okay.

The jury resumed deliberations and later sent two more notes to the trial court regarding viewing certain portions of the videotape. The jury then sent a fourth "statement" to the trial court that they were at an "impasse" and "cannot agree." Both defense counsel objected to the trial court "asking any questions other than if they can agree on a verdict or not." The trial court, citing Rule 31 of the Tennessee Rules of Criminal Procedure, brought the jury into the courtroom and inquired whether further deliberations would result in verdicts. The foreperson replied that they would not. The record shows that the jury provided the trial court with an incomplete verdict form. As the trial court asked questions of the jury in an attempt to determine whether the jury had reached verdicts on either Cole or Lopez and whether the jury had considered each of the lesser-included offenses, the jury's response indicated that they were confused. Initially, most of the jurors responded that they had reached an agreement as to count one; however, one juror asked for further instruction on the lesser-included offenses and more time to deliberate.

Without providing the jury with any additional instructions, the trial court allowed the jury more time to deliberate. During this time, the record reflects substantial discussion amongst the parties to determine whether additional instructions should be provided to the jury. Ultimately, the parties agreed that nothing further should be added to the instruction and that the jury should be sent home and return the next morning. Prior to sending the jury home for the night, the trial court gave the following instruction:

Everything you need is in these instructions, okay. Read them carefully. Your answers are in here. Facilitation, the definition is here. Simple possession, the crime is in here that definition. The only definition that you need that's not in here is criminal attempt, but that's pretty much common sense. If you really need that definition we can give it to you tomorrow, okay. Let us know.

The jury returned the next morning and reached a verdict around noon.

Although Cole argues that the trial court "coerced the minority jurors into sacrificing their convictions" by repeating the charged offenses instead of providing a single deadlock instruction under Kersey, the trial court was not required to do so under these circumstances. See Kersey, 525 S.W.2d at 145. After deliberating approximately four hours, the jury

reported they could not reach a verdict. The trial court responded by instructing the jury that they had not deliberated very long and to continue deliberations. In our view, this was appropriate given that this case involved two defendants charged with various drug offenses. The jury charge also included various lesser-included offenses for the jury's consideration. After approximately two more hours, the jury returned and reported that they were at an impasse. Apparently, because the jury had submitted a partially completed verdict form, the trial court then attempted to determine whether they had reached a verdict on either Cole or Lopez, on any of the other counts charged, or any of the lesser-included offenses. At this point, the jurors posed questions to the trial court showing their confusion. In open court, they requested further guidance from the trial court regarding the definitions of the lesser-included offenses. Out of the jury's presence, the trial court consulted with counsel and agreed that nothing further should be added to the jury instruction. The trial court then properly instructed the jury to review the instructions that had previously been given to them. By doing so, the trial court did not violate the dictates of Kersey, and Cole is not entitled to relief.

## CONCLUSION

We conclude that the trial court properly denied the motions to suppress, that the evidence was sufficient to sustain the instant convictions, that the traffic stop was not racially motivated in violation of the Fourteenth Amendment's equal protection clause, and that the jury was not "impermissibly influenced" by comments of the trial court while instructing the jury. We further conclude that the trial court did not err in refusing to discharge the jury upon receiving their first note or failing to provide "a deadlock (Kersey) instruction" at that time. Although we conclude that the trial court erred in ordering the parties into the jury room during deliberations to assist with the video equipment, we conclude that such error was harmless. Upon our review, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

-16-